AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Kristin M. Pinkston (312) 353-5300

**FILED**
**12/13/2024**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JERRY SHAIRD,
      also known as ""T""

CASE NUMBER: 24 CR 593

UNDER SEAL

CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 10, 2024 at Joliet, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841 | did knowingly and intentionally distribute a controlled substance, namely, 5 grams or more of methamphetamine (actual), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_Gabriel Garcia_

Gabriel Garcia
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: December 13, 2024  3:10PM

_Judge's signature_

City and state: Chicago, Illinois

JEFFREY COLE, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Gabriel Garcia, being duly sworn, state as follows:

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives. I have been an ATF Special Agent since approximately February 2023 and am currently assigned to the Chicago Field Division. As part of my duties as an ATF Special Agent, I investigate firearms and narcotics trafficking offenses.

2.     This affidavit is submitted in support of a criminal complaint alleging that Jerry Shaird, also known as "T", has violated Title 21, United States Code, Section 841.  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SHAIRD with knowingly and intentionally distributing a controlled substance, namely, 5 grams or more of methamphetamine (actual), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     The facts in this affidavit come from my personal observations, my personal participation in this investigation, my training and experience, information obtained from other agents, law enforcement personnel, and witnesses, physical surveillance, controlled purchases of narcotics, search warrants, review of

consensually recorded conversations, recorded videos, law enforcement reports, laboratory reports, and criminal history records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for this complaint, I have not included each and every fact known to me concerning this investigation.

### *Shaird*

4.    According to the Illinois Secretary of State's Office, immediately below is a photograph of JERRY SHAIRD:



5.    According to Will County, Illinois records, JERRY SHAIRD is a convicted felon:

a.    On or about February 6, 2006, SHAIRD was convicted of unlawful possession of cannabis and aggravated unlawful use of a weapon in the Will County, Illinois, Circuit Court and sentenced to 24 months section 10 probation and 24 months concurrent probation, 53 days WCADF, and 30 hours community service.

b.    On or about May 2, 2014, SHAIRD was convicted of unlawful possession of a controlled substance in the Will County, Illinois Circuit Court, and

sentenced to 7 years' incarceration in the Illinois Department of Corrections and various fines.

      c.    On or about September 17, 2014, SHAIRD was convicted of unlawful delivery of a controlled substance in the Will County, Illinois Circuit Court, and sentenced to 5 years' incarceration in the Illinois Department of Corrections and various fines.

      d.    On or about October 31, 2018, SHAIRD was convicted of unlawful delivery of a controlled substance in the Will County, Illinois Circuit Court, and sentenced to 7 years' incarceration in the Illinois Department of Corrections and various fines.

6.    During the course of this investigation, the UCA identified SHAIRD based, in part, on SHAIRD's Illinois driver's license photograph (reflected below), and a photograph provided by SHAIRD via text message, described below. The controlled buy transactions, discussed below, were also audio and video recorded, and multiple recorded phone calls were also obtained before and after the controlled buy transactions.

7.    I, along with the UCA, have reviewed these recorded controlled buys, and listened to the recorded calls. I have also personally conducted surveillance of SHAIRD during the course of this investigation. Based on such review, and a comparison of prior photographs and my own surveillance, I have become familiar with SHAIRD's appearance for purposes of SHAIRD's identification in this complaint.

### *Background*

8.      As explained below, between June 2024 and the present time, an UCA made controlled purchases of narcotics from SHAIRD and two of SHAIRD's associates, INDIVIDUAL A and INDIVIDUAL B.

9.      In or around June 2024, an ATF confidential informant (CI-1)[1] advised the UCA, among other information, that SHAIRD sold narcotics, and that the CI-1 had previously personally observed SHAIRD in possession of firearms and that SHAIRD had offered to sell the CI-1 a firearm.

10.      CI-1 further advised the UCA that SHAIRD was the user of the cellular telephone assigned call number ending in XXX-XXX-3135 (the "SUBJECT PHONE"). CI-1 put the UCA in contact with SHAIRD, under the guise of UCA being a potential narcotics customer for SHAIRD.

---

CI-1 cooperated with ATF from March 26, 2024, to July 8, 2024. CI-1 was deactivated as an ATF confidential informant on July 8, 2024, because CI-1 had a warrant issued for CI-1's arrest for a pending charge of shoplifting. While cooperating with ATF, CI-1 received monetary compensation, approximately $1,200.00, for CI-1's cooperation. CI-1 also previously served as a confidential informant for an out of District Sheriff's Office in hopes that CI-1's cooperation would be considered in a decision as to a resolution of pending charges against CI-1. CI-1 was deactivated as a CI for the out of District Sheriff's Office because CI-1 was criminally charged while serving as a confidential informant. Law enforcement has also confirmed that CI-1 has pending charges for theft, intimidation/threat to commit a forcible felony, resisting law enforcement, possession of cocaine, and fraud in an out of District County. CI-1 has provided information to an in District local police department but was not serving as a confidential informant with that police department. CI-1 is currently serving as a confidential informant with another in District local police department and is doing so in hopes that CI-1's cooperation will be considered by police department in its decision as to what charges, if any, to file against CI-1. CI-1 has a history of substance abuse and criminal history which includes convictions for controlled substance related charges, burglary, and financial card transaction fraud. In this investigation, CI-1 has provided information which has been corroborated by recorded telephone calls and controlled purchases of narcotics. To my knowledge, the information provided by CI-1 regarding criminal investigations has not been found to be false or misleading.[1]

11.     As discussed in more detail below, the UCA conducted two in-person controlled narcotics transactions with SHAIRD who the UCA identified as SHAIRD based, in part, on SHAIRD's Illinois driver's license photograph, and a photograph SHAIRD texted to the UCA. As explained above, those transactions were recorded and both I and UCA have reviewed those recordings. In connection with those controlled narcotics transactions, the UCA had multiple recorded phone calls with the user of the SUBJECT PHONE. Those calls were also recorded. I have listened to those recorded calls. Based on a comparison of the voice on the recordings with the recordings of SHAIRD's voice captured during the controlled narcotics transactions, I believe that SHAIRD is the user of the SUBJECT PHONE. In certain portions of this affidavit, I have referenced and summarized portions of some of the audio and video recordings obtained in this investigation.[2]

### *June 2024*

12.     On or about June 14, 2024, the UCA spoke with SHAIRD, using the SUBJECT PHONE. The call was recorded. In summary, during the call, SHAIRD

---

[2] The summaries of the text messages and recorded calls in this investigation are based on a review of those communications by law enforcement officials, including myself. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review, not final transcripts or interpretations, of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all potentially criminal communications or topics covered during the course of the recorded conversations. In certain instances, I will offer my interpretations of certain recorded conversations in brackets and otherwise. My understanding of these conversations is aided by the content and context of the conversations, my familiarity with the facts and circumstances of the investigation, my experience as a law enforcement agent, my discussions with other law enforcement officials in this investigation, and other evidence developed during the investigation.

asked what type of narcotics the UCA was interested in purchasing. The UCA relayed, in summary, that the UCA was looking to purchase methamphetamine, who SHAIRD was able to procure. They discussed prices and planned to meet for the UCA to purchase one ounce of methamphetamine for the price of $500 United States Currency on June 17, 2024. The transaction did not end up happening that day; instead, as discussed below, the transaction occurred on June 27, 2024.

13.     On or about June 26, 2024, the UCA had a phone conversation with SHAIRD, using the SUBJECT PHONE. The call was recorded. In summary, during the call, SHAIRD and the UCA agreed that the narcotics transaction would take place the next day in Gary, Indiana. The UCA related to SHAIRD that the UCA would not travel to Gary unless SHAIRD would have a "strap" for them. I have spoken with the UCA and confirmed that the UCA used the term "strap" in place of word "firearm" or "gun." Additionally, based on my training and experience, as well as the training and experience of other law enforcement agents with whom I have consulted, I understand "strap" is street slang for a firearm or gun. In response to the UCA's comment about having a "strap," SHAIRD stated "yea, hell yea I keep straps."

14.     On or about June 27, 2024, the UCA purchased approximately 25.6 grams of methamphetamine from one of SHAIRD's associates, INDIVIDUAL A, for $500 United States Currency. The controlled purchase took place in Griffith, Indiana and law enforcement conducted surveillance of the controlled buy. On that date, and during the course of text messages and phone calls between the UCA and

SHAIRD on the SUBJECT PHONE, SHAIRD texted a photograph of himself with a minor child to the UCA's phone and requested a photograph from the UCA which the UCA refused to do. The photograph texted by SHAIRD partially depicted the same person depicted above in SHARID's Illinois Secretary of State photograph as well as a minor child.

15.     For several days prior to the June 27, 2024, controlled purchase, the UCA and SHAIRD, using the SUBJECT PHONE, exchanged multiple recorded telephone calls and text messages concerning the details of the transaction, which were recorded.

16.     During one of the recorded telephone calls on June 27, 2024, SHAIRD relayed and indicated to the UCA, in summary, that INDIVIDUAL A was driving a green SUV from Joliet to Indiana to deliver the methamphetamine for him. SHAIRD conducted a three-way call between himself (using the SUBJECT PHONE), the UCA, and INDIVIDUAL A to facilitate the coordination of the meeting between INDIVIDUAL A and the UCA.

17.     The UCA contacted SHAIRD on the SUBJECT PHONE when the UCA arrived at the meeting location in Griffith on June 27, 2024. The call was recorded. In summary, during the conversation SHAIRD instructed the UCA to stay on the line with him until the transaction was conducted.

18.     When the UCA arrived at the meeting location, the UCA located INDIVIDUAL A's car, followed it to a parking spot, parked next to it and then got into INDIVIDUAL A's car. INDIVIDUAL A's car was a green KIA registered to

INDIVIDUAL A, at an address in Joliet, Illinois. The meeting was recorded. While in INDIVIDUAL A's car, INDIVIDUAL A handed the UCA a clear knotted bag of suspected methamphetamine. The UCA attempted to weigh the suspected narcotics using a scale that the UCA brought with him/her into the car; however, the scale malfunctioned. After numerous failed attempts to weigh the methamphetamine by the UCA and INDIVIDUAL A, the UCA asked INDIVIDUAL A if she was aware of the weight. INDIVIDUAL A replied, "He just told me what I'm supposed to be collecting. It should be all here." The UCA asked INDIVIDUAL A what price SHAIRD had given her in which INDIVIDUAL A replied, "five." The UCA understood this to mean five hundred dollars. The UCA handed INDIVIDUAL A $500 United States Currency. INDIVIDUAL A then handed the UCA an empty clear bag for the UCA to carry the suspect methamphetamine.

19.     The suspect methamphetamine was delivered to the Drug Enforcement Agency ("DEA") Laboratory where it was tested and, according to the DEA Laboratory, the controlled substances that the UCA purchased on June 27, 2024, in summary, consisted of approximately 24.3 grams of 99% pure methamphetamine hydrochloride.

*July 2024*

20.     After multiple recorded telephone calls and text messages between June 27, 2024, and July 10, 2024, on July 10, 2024, the UCA met SHAIRD to conduct a narcotics transaction at a business ("Business A") in Joliet, Illinois. All recorded telephone calls and text messages exchanged between the UCA with

SHAIRD were completed utilizing the SUBJECT PHONE. The meeting was recorded and law enforcement conducted surveillance of the controlled buy.

21.     For several days prior to the July 10, 2024, controlled buy, the UCA and SHAIRD, using the SUBJECT PHONE, exchanged multiple recorded telephone calls and text messages concerning the details of the transaction, which were recorded.

22.     On July 9, 2024, in summary, the UCA and SHAIRD, using the SUBJECT PHONE, exchanged a telephone call in which SHAIRD agreed to supply the UCA with "2 zips." . Based on my training and experience, and personal participation in this investigation, I understand "2 zips" means to two ounces of methamphetamine. The price per ounce had previously been discussed and agreed upon between SHAIRD and the UCA, as explained in summary above, on June 17, 2024.

23.     On July 10, 2024, the UCA drove an undercover vehicle to the agreed upon meeting location, Business A, in Joliet, Illinois. The UCA observed a silver Lexus and parked the undercover vehicle next to the silver Lexus.

24.     The UCA observed three individuals inside of the silver Lexus: SHAIRD in the driver's seat and two unidentified black males—one in the front passenger seat and the other in the backseat. SHAIRD's face was visible to the UCA and without leaving the silver Lexus he handed the UCA a clear knotted plastic bag with suspected methamphetamine and a digital scale through the UCA vehicle window. In summary, before handing over the bag, SHAIRD admitted to

the UCA that he did not bring 2 ounces and offered a price of $700 for what SHAIRD represented to be 1 ½ ounces. In exchange, the UCA provided SHAIRD $700 United States Currency. The UCA then departed the parking lot of Business A.

25.     The suspect methamphetamine was delivered to the DEA Laboratory where it was tested and, according to the DEA Laboratory, the controlled substances that the UCA purchased on July 10, 2024, in summary, consisted of approximately 39.8 grams of 100% pure methamphetamine hydrochloride.

*July 10, 2024 – September 17, 2024*

26.     After multiple recorded telephone calls and text messages between July 10, 2024, and September 17, 2024, on September 17, 2024, the UCA met SHAIRD to conduct a controlled purchase of methamphetamine at Business A in Joliet, Illinois. All recorded telephone calls and text messages exchanged with SHAIRD were completed utilizing the SUBJECT PHONE. The meeting was recorded and law enforcement conducted surveillance of the controlled buy.

27.     For several days prior to the September 17, 2024, controlled purchase, the UCA and SHAIRD, using the SUBJECT PHONE, exchanged text messages concerning the details of the transaction, which were recorded.

28.     In summary, on September 16, 2024, the UCA and SHAIRD exchanged text messages in which SHAIRD agreed to exchange "2 zips" for "500 a pop." The UCA counteroffered via text message "how bout 2 for 900." Based on my

training and experience and personal participation in this investigation, SHAIRD offered to sell the UCA 2 ounces of methamphetamine for $1000 USC and the UCA counteroffered a price of $900 USC for 2 ounces of methamphetamine. In summary, the next day, September 17, 2024, SHAIRD sent a text message to the UCA directing the UCA to meet him at Business A but did not accept or reject the UCA's counteroffer from the day before.

29.     On September 17, 2024, in summary, the UCA drove an undercover vehicle to  the rear parking lot of Business A in Joliet, Illinois. After the UCA parked the undercover vehicle in the rear parking lot of Business A, the UCA got out of the undercover vehicle and walked in the direction of Business A and observed SHAIRD walking towards the UCA. SHAIRD was the same individual who had sold the UCA the narcotics on July 10, 2024. At that time, SHAIRD informed the UCA that his cousin would be arriving in approximately five minutes with the methamphetamine. SHAIRD also related that he had approximately 60 grams of heroin and could provide a sample to the UCA. The UCA then got back in the undercover vehicle.

30.     Several minutes later, INDIVIDUAL B, got into the UCA's vehicle. INDIVIDUAL B handed a clear zip lock bag containing suspect methamphetamine to the UCA, in exchange for which the UCA gave INDIVIDUAL B $900 United States Currency. SHAIRD got into the UCA's vehicle and provided a sample of suspect heroin to the UCA. SHAIRD exited the UCA's vehicle, the UCA drove away with the suspect methamphetamine and suspect heroin.

31.     The suspect methamphetamine and suspect heroin was delivered to the Drug Enforcement Agency ("DEA") Laboratory where it was tested and, according to the DEA Laboratory, in summary, the controlled substances that the UCA purchased on September 17, 2024, consisted of approximately 55 grams of 94% pure methamphetamine and .702 grams of N-Phenyl_N [1-(2-phenylethyl)-4-piperidinyl] propenamide (fentanyl), respectively.

32. Based on the foregoing, I respectfully submit that there is probable cause to believe that, on or about July 10, 2024, also known as "T", knowingly and intentionally distributed controlled substance, namely, 5 grams or more of methamphetamine (actual), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841.

FURTHER AFFIANT SAYETH NOT.

GABRIEL GARCIA
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone December 13, 2024.

Honorable Jeffrey Cole
United States Magistrate Judge

12